**UNITED STATES of America,**
**Plaintiff,**

v.

**Michael K. BARRINGTON, Defendant.**

**No. CR.A. 2:02CR53.**

United States District Court,
E.D. Virginia,
Norfolk Division.

June 4, 2002.

**774**

Ian K. Thornhill, Office of U.S. Atty., Norfolk, VA, for U.S.

Frank W. Dunham, Jr., Office of Public Defender, Richmond, VA, for defendant.

### *MEMORANDUM OPINION AND ORDER*

JACKSON, District Judge.

This matter comes before the Court on Defendant Michael Barrington's motion to suppress evidence seized as a result of a search of Defendant's vehicle during a traffic stop. Having conducted a hearing on May 13, 2002, this matter is now ripe for judicial determination. For the following reasons, the Court **GRANTS** Defendant's motion to suppress.

### I. FINDINGS OF FACT

Having reviewed a video tape with audio of the traffic stop at issue, and having heard oral testimony, the Court makes the following factual findings by a preponderance of the evidence. On December 3, 2001, Virginia State Trooper M.W. Cotten observed Defendant driving a vehicle with Georgia license tags on Granby Street near Ward's Corner in Norfolk, Virginia, heading towards the I–64 interchange. Defendant proceeded to enter I–64 West. Having observed that the windows on the vehicle were in violation of Virginia law, Trooper Cotten stopped defendant on I–64 West near Bay Avenue in Norfolk at approximately 4:50 p.m. Trooper Cotten's squad car was about ten feet behind Defendant's vehicle. Once Trooper Cotten approached Defendant's vehicle, he informed Defendant that he was stopped for the tint on the vehicle's windows, and proceeded to check the tint using a meter. Defendant informed Trooper Cotten that the vehicle belonged to his girlfriend, who was in the military. At approximately 4:52 p.m., Trooper Cotten completed the window tint check, and asked Defendant to step out of the vehicle and step to the rear of the vehicle. Defendant stepped out of the vehicle and started towards the rear, then quickly turned back towards the vehicle, stating that he needed to get something out of the vehicle. As Trooper Cotten turned back toward Defendant's vehicle, Defendant reached into the driver's side of the vehicle and retrieved a cellular telephone before Trooper Cotten could determine what Defendant was retrieving. Trooper Cotten did not take any

protective action when Defendant reached into the vehicle out of his view.

Once Trooper Cotten and Defendant were at the rear of Defendant's vehicle, Trooper Cotten instructed Defendant to place his hands on the hood of the squad car, then proceeded to pat him down. The pat down did not produce any evidence. At approximately 4:53 p.m., Defendant sat in the squad car on the passenger side as instructed by Trooper Cotten. The passenger side door window was down. Trooper Cotten then proceeded to draft citations for tinted windows and a seat belt violation. While doing so, Trooper Cotten and Defendant engaged in casual conversation.

At approximately 5:01 p.m., Trooper Cotten asked Defendant where he was coming from and if he had made any stops along the way. Trooper Cotten testified at the hearing that he had observed Defendant leaving a cemetery off Granby Street, which is purportedly known to harbor criminal activity. In response to Trooper Cotten's inquiry, Defendant responded that he was coming from home and that he did not make any stops. At approximately 5:02 p.m., while still drafting the citations, Trooper Cotten asked Defendant if he had "anything illegal in the car," and if there were any weapons, guns or bombs in the vehicle. Defendant responded no. Trooper Cotten then asked if the vehicle had ever been searched, and Defendant responded that it was his girlfriend's car. Trooper Cotten then asked, "Do you mind if I take a look?" Defendant responded, "Sure." Cotten proceeded to state that "they got us searching everything basically." Defendant then stated, "I'm really late for work already." Trooper Cotten stated that it would only take thirty seconds, and then proceeded to approach Defendant's vehicle.

Before Trooper Cotten started the search, Defendant, who was still seated in the squad car, called Trooper Cotten back by yelling, "Officer, Officer." Trooper Cotten returned to the passenger side of the squad car, and Defendant asked Trooper Cotten what was the purpose of searching the vehicle. Trooper Cotten responded, "I search every car I can" looking for bombs, weapons or drugs. Defendant continued to protest the search of the vehicle. At approximately 5:04 p.m., at Trooper Cotten's request, a Virginia Department of Transportation (VDOT) tow truck driver, Clifton Brown, came upon the scene.

Defendant asked Trooper Cotten if he was being held or being accused of anything. Trooper Cotten responded that Defendant was not being accused of anything. However, as a result of Defendant's continued protest, Trooper Cotten stated that Defendant was making him nervous because he didn't want him to search the vehicle. "Most people who don't have nothing to hide don't mind being held up" for thirty seconds. Defendant stated that he didn't want to be held responsible if something such as marijuana was found in the ashtray or something like that because it was not his vehicle, and that he was late for work. Trooper Cotten guaranteed Defendant that he would not hold Defendant responsible for anything like that; he was just looking for weapons or bombs. While Defendant continued to protest the search, stating "Wait a second, wait a second," Trooper Cotten walked away from the squad car toward Defendant's vehicle. Defendant yelled "Officer" repeatedly, but Trooper Cotten ignored him, told Brown not to let Defendant out of the vehicle, then proceeded to Defendant's vehicle. The noise from the traffic on I–64 was at the same level as it was when Defendant first called Trooper Cotten back to the squad car. Brown stood directly in front of the passenger side door. In a loud and argumentative tone of voice, Defendant re-

peatedly told Brown to tell Trooper Cotten that he didn't want the vehicle searched. Defendant tried to get out of the vehicle, but Brown kept him in the squad car. Despite Defendant's protest, Trooper Cotten searched the vehicle, and uncovered a .38 caliber revolver under the driver's seat.

## II. DISCUSSION

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. It is well settled that a search conducted without a warrant is per se unreasonable unless a valid exception to the warrant requirement exists. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The Government argues that the search was valid because it was a permissible protective sweep to which Defendant nonetheless consented.

### A. Protective Sweep

The Supreme Court has recognized that the possibility of a "threat to the safety of law enforcement officers may constitute exigent circumstances justifying a warrantless search or seizure." *United States v. Legg,* 18 F.3d 240, 244 (4th Cir.1994) (surveying Supreme Court decisions). In *Michigan v. Long,* the Supreme Court held that the police may conduct a protective sweep of a vehicle stopped for a traffic infraction upon a reasonable belief that the suspect is dangerous and may gain immediate control of weapons. 463 U.S. 1032, 1049, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (citing *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); *United States v. Stanfield,* 109 F.3d 976, 980 (4th Cir.1997). A protective sweep is permissible on less than probable cause because the search is limited to that which is necessary to protect the safety of officers. *Maryland v. Buie,* 494 U.S. 325, 335 n. 3, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). The sole justification of the search is the protection of the police officer and others nearby. *Terry v. Ohio,* 392 U.S. 1, 29, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Therefore, the reasonableness of a protective sweep must be determined by weighing the competing interests of the officer's safety and the individual's right to be free from arbitrary interference. *United States v. Sakyi,* 160 F.3d 164, 167 (4th Cir.1998) (citing *Pennsylvania v. Mimms,* 434 U.S. 106, 109, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)); *United States v. Baker,* 78 F.3d 135, 138 (4th Cir.1996).

In order for the search in this case to constitute a valid protective sweep, Trooper Cotten must have harbored a reasonable belief that Defendant was dangerous and may gain immediate control of a weapon. Reasonable belief must be based on specific and articulable facts. *Long,* 463 U.S. at 1049, 103 S.Ct. 3469. While every traffic stop poses a meaningful level of risk to the safety of an officer, the officer must perceive an *appropriate* level of suspicion of criminal activity and apprehension of danger in order to conduct a valid protective sweep. *Sakyi,* 160 F.3d at 168–69. Factors consistent with innocent travel can, when taken together, give rise to reasonable suspicion. *United States v. Brugal,* 209 F.3d 353, 359 (4th Cir.2000) (citing *United States v. Sokolow,* 490 U.S. 1, 9, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) ("[A]ny one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion.")). However, "[t]he articulated factors together must serve to eliminate a substantial portion of innocent travelers" before the requirement of reasonable belief is satisfied. *Id.*

In this case, the Government argues that Trooper Cotten had a reasonable belief that Defendant may be armed because (1) Defendant exited an area known for drug distribution, (2) Defendant reached

toward the floorboard once the traffic stop was initiated, (3) Defendant seemed nervous and his hands were shaking, (4) Defendant repeatedly glanced towards the floorboard, and (5) Defendant stated he was coming from home and had made no stops along the way.

■ Although these articulated facts, when viewed in their totality, could give rise to a reasonable belief that a suspect is dangerous, Trooper Cotten's conduct during the traffic stop are inconsistent with the belief that Defendant was dangerous. First, the facts articulated by Trooper Cotten occurred before Trooper Cotten checked the tint on the windows. Trooper Cotten took no steps to secure Defendant or the vehicle prior to or during the tint check. It is incredible that Trooper Cotten feared that Defendant may gain immediate control of weapons, yet took no action to secure his safety.

Second, when Trooper Cotten told Defendant to go to the rear of the vehicle, Defendant abruptly turned around and reached into the vehicle to retrieve what turned out to be a cellular phone from the driver's side of the car. Trooper Cotten testified that he feared for his life when he told Defendant to get out of the vehicle. However, the fact that Trooper Cotten let Defendant walk back to the vehicle to retrieve something without taking any measures to secure his safety unequivocally demonstrates that Trooper Cotten did not, as a matter of fact, harbor a reasonable belief that Defendant was dangerous and may gain immediate access to a weapon.

Third, Trooper Cotten testified that he called for backup, but he did not wait for backup before conducting the search. He asked an unarmed VDOT tow truck driver to watch Defendant and not let Defendant get out of the squad car, who sat uncuffed in the front seat. · Surely, a reasonable prudent officer would not expect an unarmed tow truck driver to take any protective measures against a purported dangerous motorist.

The purpose of a protective sweep is to protect the safety of officers and others nearby. *Terry,* 392 U.S. at 29, 88 S.Ct. 1868. Having had an opportunity to view the video tape and weigh the veracity of Trooper Cotten's testimony, the Court finds that Trooper Cotten did not bear an appropriate level of apprehension of danger warranting the search of the vehicle. Aside from conducting a pat down, the validity of which is not at issue, Trooper Cotten took no steps to ensure his protection until after the proper scope for the traffic stop ceased.[1] *See United States v. Rusher,* 966 F.2d 868, 876 (4th Cir.1992) (stating that the need for the traffic stop ends upon proof of a valid license and registration, and after issuing a citation).[2] It is unbelievable that Trooper Cotten, given his level of experience, would harbor the belief that he was in danger and yet fail to take any steps to secure his safety prior to issuing the citations. The factual circumstances underlying the search, when viewed in their totality, simply do not support a finding that Trooper Cotten harbored a reasonable belief that Defendant

1. Trooper Cotten testified that he asked Defendant for permission to pat him down. After reviewing the tape, however, it is clear that Trooper Cotten directed Defendant to put his hands on the squad car and proceeded to search him. Trooper Cotten did not ask for permission to pat Defendant down, and Defendant certainly did not consent to the pat down. Notably, the pat down did not produce any evidence.

2. The Court does not suggest that Trooper Cotten exceeded his authority by asking Defendant questions once he issued the citations. *See Rusher,* 966 F.2d at 877. The Court need not address this particular issue to determine whether the search was a valid protective sweep.

was dangerous and may gain immediate access to a weapon. Thus, the search was not a valid protective sweep under the Fourth Amendment, and the evidence obtained therefrom is not admissible on that ground.

### B. Consent to Search

Having determined that. the search was not a valid protective sweep, the Court must next determine whether Defendant consented to the search of the vehicle. A search pursuant to consent is an enumerated exception to the warrant requirement. *Schneckloth,* 412 U.S. at 219, 93 S.Ct. 2041; *United States v. Lattimore,* 87 F.3d 647, 650 (4th Cir.1996) (en banc). If a search is consensual, the Fourth Amendment is not implicated. *Rusher,* 966 F.2d at 877. Whether voluntary consent was given is a question of fact. *Lattimore,* 87 F.3d at 650. The government bears the burden of proving that Defendant "freely and intelligently [gave his] unequivocal and specific consent to the search, uncontaminated by any duress or coercion, actual or implied." *United States v. Morrow,* 731 F.2d 233, 236 (4th Cir.1984) (citations omitted).

"In determining whether consent to a search was freely and voluntarily given, the totality of the circumstances surrounding the consent must be examined." *Lattimore,* 87 F.3d at 650 (citing *Schneckloth,* 412 U.S. at 227, 93 S.Ct. 2041). Pertinent circumstances include the character of the accused, the conditions under which the consent to search was given, including the officer's conduct, and whether the accused knew that he possessed a right to refuse consent. *Id.*

■ The Government argues that Defendant consented to the search, relying principally upon Defendant's response to Trooper Cotten's request for permission to search. After asking if Defendant had anything illegal in the vehicle, Trooper Cotten asked Defendant, "Do you mind if I take a look?" Defendant responded, "Sure." Defendant then went on to say "I'm really late for work already." Although this particular dialogue has been held to convey consent, *United States v. Price,* 54 F.3d 342, 346 (7th Cir.1995), the circumstances in this case suggest otherwise. In *Price,* the officer asked the defendant, "Do you mind if I take a look?" and the defendant responded, "Sure." The district court held that the "sure" meant that the defendant agreed to the search, reasoning that the defendant at no time offered any objections to the search. In doing so, the district court noted that the defendant's response to the officer's question "is ambiguous and thus capable of being interpreted as either 'Go ahead' or 'No way.'" *Id.*

Trooper Cotten's question and Defendant's response in this case are identical to that in *Price.* However, the Court believes that the response "sure" is not ambiguous, but rather conveys the lack of consent, as in "Sure, *I mind.*" Nonetheless, whether a defendant protests an ensuing search "is part of the totality of the circumstances in which voluntary consent is measured." *Amato v. City of Richmond,* 875 F.Supp. 1124, 1137 (E.D.Va. 1994); *United States v. Gonzalez–Basulto,* 898 F.2d 1011, 1013 (5th Cir.1990) (holding defendant's failure to protest at any time is considered evidence that a search did not exceed consent). In cases where a defendant's response to a request for permission to search is ambiguous, courts have generally relied upon the defendant's failure to protest the search in finding consent. *Price,* 54 F.3d at 346–47; *Gonzalez–Basulto,* 898 F.2d at 1013; *United States v. Ponce,* 8 F.3d 989, 998 (5th Cir. 1993) (holding officer did not exceed scope of initial consent to weapons search where defendant did not protest removal of contents of his watch pocket); *see also United States v. Avent,* 984 F.Supp. 961, 965

(E.D.Va.1997), *aff'd,* 162 F.3d 1156, 1998 WL 537927 (4th Cir.1998) (finding no consent to search where defendant repeatedly denied owning vehicle).

Unlike the facts in *Price,* Defendant repeatedly protested the search. Defendant stated that he was already late for work. Defendant called Trooper Cotten back to the squad car and repeatedly questioned the need to search the vehicle. When Trooper Cotten left to search the vehicle the second time, Defendant attempted to call him back again, telling him to "Wait a second, wait a second." Furthermore, Defendant told the VDOT driver to tell Trooper Cotten he didn't want the vehicle searched and tried unsuccessfully to get out of the squad car.[3] None of these actions suggest that the search was consensual. *See, e.g., United States v. Smith,* 30 F.3d 568, 571 (4th Cir.1994) (concluding that defendant consented to the search of his car by unlocking the car door); *United States v. Wilson,* 895 F.2d 168, 172 (4th Cir.1990) (per curiam) (finding consent to a pat down where defendant shrugged his shoulders and raised his arms). The Government's assertion that Officer Cotten did not hear Defendant protesting the search of the vehicle is simply incredible. Trooper Cotten engaged in enough dialogue with Defendant prior to the search to know that he did not have Defendant's unequivocal consent. In fact, Trooper Cotten's state-

ments that Defendant was making him nervous and that "most people who don't have nothing to hide don't mind being held up" demonstrate that Trooper Cotten knew that Defendant did not consent to the search.[4]

The Fourth Amendment proscribes " 'arbitrary and oppressive interference by [law enforcement] with the privacy and personal security of individuals.' " *Weaver,* 282 F.3d at 302 (quoting *INS v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984)). Pursuant to this principle, it is axiomatic that Defendant's continued protest of the search supports a finding that the "Sure" uttered in response to Trooper Cotten's question does not amount to consent. The Court rejects the Government's contention that Defendant's response meant that he consented to the search, for this equivocal statement may not be divorced from the underlying circumstances. The ensuing dialogue between Trooper Cotten and Defendant would have alerted a reasonable officer that there was no consent. And as stated previously, Trooper Cotten's own statements reflect that he knew there was no consent, for his demeanor and actions evidence that Trooper Cotten understood the nature of Defendant's protest. Thus, the Court finds that Trooper Cotten did not have Defendant's unequivocal and specific consent to search Defendant's vehicle, and

---

**3.** Evidence produced at the hearing reflects that Defendant was not necessarily free to leave the squad car. Although Trooper Cotten told Defendant he was not being accused of anything, Trooper Cotten told Brown not to let Defendant out of the vehicle. And when Defendant attempted to get out of the vehicle, Brown stopped him, suggesting that Defendant was in fact restrained. However, whether this amounted to an unlawful seizure that exceeded the scope of the traffic stop is not pertinent to the Court's ruling. *See, e.g., United States v. Sullivan,* 138 F.3d 126, 131 (4th Cir.1998) (holding a routine traffic stop seizure becomes illegal when the purpose justify-

ing the stop is exceeded "unless a reasonable suspicion of some other crime exists"). Thus, the Court will not decide this issue.

**4.** Given Trooper Cotten's statement, the Court is compelled to iterate that Defendant's act of protesting an unlawful search does not, without more, furnish the minimal level of objective justification needed for a seizure, including that commensurate with a *Terry* stop. *United States v. Weaver,* 282 F.3d 302, 312 (4th Cir.2002) (citing *Florida v. Bostick,* 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)); *United States v. Wilson,* 953 F.2d 116 (4th Cir.1991).

the evidence obtained therefrom is not admissible on that ground.

## III. CONCLUSION

For the foregoing reasons, the search of Defendant's vehicle was unlawful under the Fourth Amendment. Accordingly, Defendant's motion to suppress is hereby **GRANTED.**

**IT IS SO ORDERED.**